Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a pre-trial agreement, filed on September 17, 1996, and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case; the parties are properly before the Commission; and, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured with Carson Brooks, Inc., as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The plaintiff worked for the defendant-employer from June 12, 1989 through February 10, 1995.
5. The plaintiff's average weekly wage was $288.54, which yields a compensation rate of $192.37 per week, based upon the I.C. Form 22, which was stipulated into evidence.
6. The issues for determination are:
 a. Whether the plaintiff has contracted a compensable occupational disease of her hands for which she is entitled to compensation;
 b. Whether the plaintiff's condition is causally related to her employment with the defendant; and
 c. Whether the plaintiff's claim should be barred due to lack of notice pursuant to N.C. Gen. Stat. §§ 97-22 and 58.
7. The parties stipulated documentary evidence, as follows:
a. Industrial Commission Forms, twelve pages;
b. Interrogatory Answers, sixteen pages;
 c. Records of Dr. Allen O. Smith, forty-five pages;
d. Records of Dr. Larry Anderson, eight pages;
e. Records of Dr. Mark A. Faruque, three pages;
f. Records of Dr. Dennis Payne, four pages;
g. Records of Dr. William L. Sims, fifteen pages;
h. Records of Dr. E. Brown Crosby, two pages;
 i. Medical History from Drexel Heritage, two pages;
 j. Department of Vocational Rehabilitation, five pages;
k. Employment Records, eight pages; and
l. Records of Dr. William Pekman, two pages.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following findings of fact:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, the plaintiff was a fifth grade-educated female, who had been employed by defendant-employer furniture manufacturer as a hand padder/hand sander from June 12, 1989 to February 10, 1995.
2. Plaintiff's hand padding job duties included placing 40-50 chair frames on a work table each eight-hour work day, mixing stain in a bowl, dipping a cloth in the bowl and applying stain by rubbing the cloth lightly on the exposed surfaces of the frame while holding the chair frame. She used her right hand in a palm open position to rub the wood surface of the chair to apply the stain. Plaintiff had to adjust her hand to various angles to correspond with the position of the wood on the chair frame. The plaintiff performed these tasks repetitively approximately two-to-four hours of her eight-hour work day.
3. The sanding job required the plaintiff to grip sandpaper with her right hand and while applying a medium amount of force, rub the entire frame. The plaintiff performed this task approximately two-to-three hours of her eight-hour work day, and would sand approximately thirty to forty chairs per shift.
4. The plaintiff would also perform the highlighting job, depending on the style of chair being made. This job required her to use her right hand to put marks on chairs, using steel wool. A slight pressure of the fingers, wrists, and arm was required to perform this task.
5. In addition, the plaintiff would wipe glaze, which required her to hold a paint brush in her right hand in a manner similar to how one would hold a pen, and brush the chair frame with stain using the brush. This task required a combination of wrist action and arm movement from the elbow in "up and down" or "back and forth" motions, depending upon the shape of the wood grain.
6. In order to perform her hand padding, sanding, highlighting, and wipe glazing job duties, the plaintiff was required to use her right hand, arm and wrist repetitively and to repetitively grip objects with her right fingers and hand.
7. Plaintiff had suffered from Kienbeck's disease in her right wrist since approximately 1971 and had complained of pain in her right hand as a result. In approximately 1978, Dr. Jennings had suggested that plaintiff consider implanting a plastic bone in her right wrist.
8. On April 19, 1984, while working for Century Furniture, the plaintiff saw Dr. Larry G. Anderson, an orthopedic doctor in Morganton, N.C., for a second opinion on whether she needed bilateral carpal tunnel release surgery. A nerve conduction study of both wrists a few weeks earlier had revealed "pinching" of the nerves in both wrists. On April 19, 1984, Dr. Anderson diagnosed bilateral carpal tunnel syndrome, and probably avascular necrosis of an old fractured scaphoid of the right wrist. He thought that surgery was indicated, but the record does not indicate that plaintiff had surgery at this time.
9. The plaintiff returned to Dr. Anderson again on January 21, 1986, complaining of pain in her neck which radiated into her right shoulder and down her right arm to the elbow. Dr. Anderson suspected a cervical problem, for which he referred plaintiff to Hickory Neurosurgery on March 26, 1986.
10. On April 1, 1986 plaintiff presented to Dr. William L. Sims, a neurosurgeon in Hickory, N.C., upon referral from Dr. Anderson. She reported being involved in an auto accident in 1984 which resulted in her having some neck pain at the time. On April 8, 1986, Dr. Sims diagnosed plaintiff as having a possible herniated disc for which he admitted her April 17, 1986 to Frye Regional Medical Center in Hickory for a cervical mylelogram and possibly surgery.
11. Examination and testing revealed a right C-7 radiculopathy, for which Dr. Sims performed right C5-6 foramenotomy and decompression surgery on April 18, 1986, and discharged plaintiff April 25, 1986.
12. On September 5, 1986 Dr. Sims referred the plaintiff to Dr. William M. Pekman, an orthopedic surgeon in Hickory, for a second opinion which Dr. Pekman rendered on September 8, 1986. He noted that plaintiff's pain had been associated with her cervical spine as well as her mid-thoracic region and right shoulder. Radiographs showed advanced Kienbeck's disease with a collapse of the lunate (a bone in the wrist) and mild proximal migration of the capitate (also a bone in the wrist) for which Dr. Pekman suggested that plaintiff should consider one of the following: "STT arthrodesis coupled with implant arthoplasty, proximal row carpectomy, or wrist arthrodesis." He concluded that "(g)iven her desires a proximal row carpectomy is most compatible with her needs." The record does not indicate that plaintiff proceeded with any of these alternatives at this time.
13. Thereafter, plaintiff returned to Dr. Sims on January 5, 1987, with continued complaints of right shoulder and arm pain. Dr. Sims arranged for plaintiff to have a CT scan of her neck and an EMG, both of which were "unremarkable."
14. While doing the hand padding/sanding job for defendant-employer in 1991, both of plaintiff's hands would hurt and become numb. Plaintiff presented to Dr. Stanley Peters October 9, 1991 who diagnosed her as suffering from tenosynovitis.
15. On April 16, 1993 the plaintiff sought treatment with Dr. Larry Anderson, complaining of right upper extremity problems. Although Dr. Anderson suspected right carpal tunnel syndrome, nerve conduction studies were reported as normal. The plaintiff reported to Dr. Anderson that her job required repetitive use of her right arm and hand, and a lot of flexion and extension and lifting involving the elbow.
16. On May 7, 1993 Dr. Anderson took the plaintiff out of work for one and one-half weeks, and placed her in a long-arm padded splint. On May 17, 1993, Dr. Anderson prescribed that plaintiff remain out of work an additional week. On May 24, 1993 Dr. Anderson released plaintiff to return to work on Wednesday, May 26, 1993.
17. On June 14, 1993 plaintiff presented to Dr. Anderson complaining of pain in the posterior of her right shoulder and trapezius region. Dr. Anderson decided to refer plaintiff to Dr. Allen O. Smith, a neurologist in Hickory, for an assessment.
18. On June 15, 1993 plaintiff was seen by Dr. Smith for an assessment of her neck and right shoulder pain. Dr. Smith diagnosed plaintiff with cervical spondylosis with right arm and neck pain. He advised that further surgery would not necessarily relieve her pain. (Plaintiff's prior surgery for similar symptoms was April 18, 1986.)
19. On April 18, 1994 plaintiff presented to Dr. Anderson complaining of pain in her neck and right arm and right hand. Dr. Anderson suggested that she return to Dr. Sims, who had performed her earlier neck surgery.
20. Plaintiff returned to Dr. Smith December 20, 1994, and again December 30, 1994 with a variety of pain complaints. An MRI revealed early cord indentation at C4 on 5, for which traction was recommended. Dr. Smith was of the opinion that plaintiff's problem was cervical spondylosis with superimposed osteoarthritis. The plaintiff advised Dr. Smith that her job bothered her.
21. Plaintiff resigned her job on February 10, 1995, stating that her pain prevented her from doing her work, although no physician prescribed that she leave her job.
22. On or following March 7, 1995, Dr. Smith completed the physician's portion of a Medical Examination form from the Catawba County Department of Social Services on behalf of plaintiff, at which time he noted that plaintiff was capable of full-time work, although repetitive motion jobs would bother her, as would lifting more than thirty pounds. Dr. Smith further noted that he did not tell the plaintiff to quit her job at Drexel.
23. On July 18, 1995 plaintiff again presented to Dr. Smith who further diagnosed plaintiff as suffering from polymyalgias in her back and shoulders and polymyalgias in her knees. An MRI showed no acute changes in her neck. Dr. Smith noted that plaintiff was going to vocational rehabilitation, but should avoid jobs requiring repetitive motion.
24. On July 18, 1995 plaintiff also saw Dr. Dennis Payne, a rheumatologist, for the first time, for the purpose of getting a disability evaluation for an application. Plaintiff complained of diffuse pain in her muscles in multiple parts of her body. She complained of pain in the neck, upper extremity, hands, wrist, spine, and lower extremities. Dr. Payne diagnosed plaintiff as suffering from pain in multiple joints (polyarthralgias) and multiple muscles (polymyalgias). Dr. Payne later changed his diagnosis of plaintiff's condition to primarily fibromyalgia by February 20, 1996.
25. At the time of plaintiff's evaluation by Dr. Payne, plaintiff had been out of work for over five months. She complained of diffuse pain all over, not just in her hands. She had not used her hands for repetitive work for defendant-employer for over five months. Her Kienbeck's disease had reached the advanced stage of deterioration, approximately nine years earlier and approximately three years before plaintiff began employment with defendant. Kienbeck's disease causes pain and sometimes swelling in the wrist.
26. The plaintiff was seen by Asheville hand surgeon Dr. E. Brown Crosby on September 19, 1995. She gave a history of having to quit work due to pain in her wrists. Plaintiff testified that she quit working due to pain in her hands, neck, shoulders and elbow. Dr. Crosby found that the lunate bone in plaintiff's right wrist had collapsed, which was indicative of a very advanced stage of deterioration from Kienbeck's disease, secondary to necrosis of the bone. This condition, however, had existed since at least September, 1986. Dr. Crosby opined that the plaintiff's job of hand sanding and hand padding aggravated her Kienbeck's disease and placed plaintiff at an increased risk of contracting or aggravating this condition. However, he further opined that the plaintiff was able to return to work so long as she avoided repetitive stress on her hands. Dr. Crosby explained that Kienbeck's disease is a condition where the lunate bone in the wrist develops a compromise in circulation from either a single trauma or multiple repetitive episodes of cumulative trauma resulting in an ultimate collapse and decay (necrosis) of the bone.
27. In his deposition Dr. Payne opined that, assuming the plaintiff's job required repetitive motions of both hands, it could have aggravated her Kienbeck's disease and carpal tunnel syndrome and that a person who engages in the type of work activities in which the plaintiff engaged would be at a higher risk of developing Kienbeck's disease ("definitely"), and carpal tunnel syndrome ("possibly") than members of the general population who are not similarly exposed. Plaintiff, however, did not develop Kienbeck's disease as a result of her work; therefore, Dr. Payne's opinion testimony does not establish that plaintiff's job placed her at an increased risk for contracting Kienbeck's disease over that of the general public. Dr. Payne further opined that if plaintiff had advanced Kienbeck's disease and carpal tunnel syndrome before becoming employed with defendant-employer, her work did not cause plaintiff's Kienbeck's disease or carpal tunnel syndrome, but her symptoms could have been worsened by her work. He further was of the opinion that a person who engages in the work activities in which the plaintiff engaged would probably not be at a higher risk of developing fibromyalgia, but plaintiff's carpal tunnel syndrome possibly could have led to, or placed plaintiff at an increased risk of developing fibromyalgia.
28. Plaintiff's symptoms as reported to Dr. Payne, however, were not consistent with just carpal tunnel syndrome, or Kienbeck's disease; they were more consistent with fibromyalgia which Dr. Payne did not believe her job placed her at a higher risk of contracting.
29. Plaintiff's job with defendant-employer increased her pain symptoms caused by her advanced Kienbeck's disease, but did not significantly aggravate or increase the deterioration of her wrist due to the disease process itself.
30. Plaintiff has not proven by the greater weight of the evidence that she suffered disablement as a result of her job duties with defendant-employer. Dr. Crosby treated plaintiff primarily for her hands and wrists problems. However, plaintiff's stated reasons for leaving work were due to neck, shoulder, elbow as well as hand pain. No doctor took plaintiff out of work.
31. Greater weight is given to the opinion of Dr. Payne over that of Dr. Crosby on the issue of whether her employment caused, or significantly contributed to and placed plaintiff at an increased risk of contracting Kienbeck's disease over the general population.
32. Plaintiff's ganglion cyst which developed on her left wrist over a year after she quit work was not caused by her work with defendant-employer.
33. Plaintiff has failed to prove by the greater weight of the evidence that she was unable to work as of February 10, 1995, or any other time thereafter due to a compensable occupational disease.
34. Dr. Crosby was the first physician to tell the plaintiff about the probable relationship between her job and her hand problems in September, 1995. This was the first notice plaintiff had that her condition for which she was being treated may be occupationally-related. She gave timely notice that she was claiming compensation for an occupational disease when she filed the I.C. Form 18 on September 22, 1995.
35. The plaintiff kept a child in her home from June 1995 to August 1996 earning $50.00 per week.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSION OF LAW
1. Plaintiff has failed to prove by the greater weight of the evidence that her Kienbeck's disease or aggravation thereof, carpal tunnel syndrome, fibromyalgia, ganglion cyst or other conditions constituted compensable occupational diseases within the meaning of N.C. Gen. Stat. § 97-53(13).
2. Plaintiff is not entitled to any workers' compensation benefits due to an occupational disease.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's claim is and under the law must be DENIED.
2. Each side shall pay the costs, except that the defendant shall pay the expert witness fees of $256.00 to E. Brown Crosby, M.D., and $340.00 to Dennis Payne, M.D.
 S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ _______________ LAURA K. MAVRETIC COMMISSIONER
S/ _______________ RENÉE C. RIGGSBEE COMMISSIONER